IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

SHIRLEY A. ALBACH,

                Plaintiff,        Case No. 3:01 CV 7628

-vs-

                                MEMORANDUM OPINION

DOUGLAS S. HESS, M.D.,

                Defendant.

KATZ, J.

On May 31, 2006, the Court conducted a bench trial solely on the timeliness of Plaintiffs' complaint, which seeks redress for medical malpractice and loss of consortium. The parties have filed post-hearing briefs (Doc. Nos. 144, 148, 151), and have agreed to receive the Court's ruling in the form of an opinion, as opposed to findings of fact and conclusions of law. After considering the testimony and documentary evidence, the Court finds the one-year statute of limitations on Plaintiffs' claims expired before they sued the Defendant. Because Plaintiffs' claims are untimely, judgment in favor of Defendant is appropriate.

**BACKGROUND**

On May 5, 1998, Plaintiff Shirley Albach, of Linwood, Michigan, near Bay City, underwent gastric bypass surgery performed by Defendant Dr. Douglas Hess in Bowling Green, Ohio. During the course of the surgery, Dr. Hess unexpectedly had to remove Mrs. Albach's spleen. He operated again on May 23, 1998, to drain two abscesses and insert a feeding tube. Mrs. Albach left the hospital on June 17, 1998, and returned to her home in Michigan.

Before the surgery, Mrs. Albach watched a video Dr. Hess showed to all his patients, in which he told them:

> We will contact your doctor if you wish for us later on after you have your operation so that he'll know how you're getting along, or her, and that they will be able to take care of you too and will certainly know what's important for you. You need to see somebody that knows something about this operation at least once a year for the rest of your life and maybe more often if you're having some of the problems. They are all reversible.

(Plaintiff Ex. 1). Additionally, Plaintiff signed an informed consent document stating that the procedure would "require that you have follow-up visits with us or someone who understands your problem intermittently throughout the rest of your life. . . . It will be your responsibility to make and keep appointments and to be seen by us or some physician at least every 6 to 9 months." (H03693).[1]

On June 30, 1998, Mrs. Albach returned to Dr. Hess's office for her first post-operative check-up, and saw him again approximately nine times between then and March 19, 1999, when she was told to return in six months. She made an appointment for September 24, 1999, but did not keep it. Her attorneys claimed in their Trial Brief and opening statement that Mrs. Albach missed the appointment because she fell down a ladder and injured her knee, requiring her to use crutches. However, after opposing counsel established that Mrs. Albach was treated for the fall on September 15, applied for a job at Burger King on September 21, and was hired on September 22, Mrs. Albach testified that she missed the appointment because she simply forgot, and that she must not have received a voice message Dr. Hess's office left after she failed to show up. Plaintiff did not return to Dr. Hess's office until November 14, 2000, twenty months after she last saw him.

---

[1] Such citations refer to the Bates stamp number of the individual page. Each exhibit was identified by individual Bates stamp number at trial. *See* (Doc. No. 141, Exhibit and Witness List).

Mrs. Albach agreed that she received no care or treatment from Dr. Hess from March 20, 1999 through March 14, 2000.[2]

Meanwhile, beginning in May of 1999, Mrs. Albach saw her primary care physician in Michigan, Dr. Parmer, and his partner, Dr. Carter, for various maladies those physicians eventually determined were related to complications from the gastric bypass surgery. Prior to May of 1999, Mrs. Albach had not seen Dr. Parmer or Dr. Carter since before her surgery. Mrs. Albach first complained to them of abdominal pains, unexplained fevers, night sweats, cramping, and diarrhea, and then, in August of 1999, Dr. Parmer became concerned that Mrs. Albach was losing too much weight as a result of her surgery. She had reached her goal weight of 135 pounds, but her weight had continued to decrease, rather than stabilize. She testified that Dr. Parmer coordinated all of her care and treatment for those symptoms from May 1999 through November 2000, *all the while encouraging her to return to Dr. Hess.*

At an August 12, 1999, appointment, Dr. Parmer discussed with Mrs. Albach the possibility of returning to Dr. Hess for either medical or surgical treatment for her pain, fevers, digestive symptoms, and excessive weight loss. According to Dr. Parmer's testimony, Mrs. Albach told him "that she had a bad experience there [with Dr. Hess] and was not happy with that and really wanted to pursue a second opinion to look for another option than returning to where she had the original surgery." Dr. Parmer acknowledged on cross-examination that at her August 12, 1999, office visit, Mrs. Albach "refused" to return to Dr. Hess, and, on August 21, 1999, Dr.

---

[2] Counsel said "March 14" likely meaning "November 14," the date of Mrs. Albach's next visit to Dr. Hess, but Mrs. Albach may not have been aware of counsel's intent when she answered the question.

3

Parmer wrote a letter to the Bariatric Center of Ann Arbor, Michigan, stating as much and asking them to consider taking on Mrs. Albach as a patient. He wrote:

> Due to the poor experience that she had at that hospital [Wood County Hospital in Bowling Green] with the surgeon involved [Dr. Hess], she and her husband both have refused to go back to see him and feel that her care would best be provided at another location. I tend to concur and have suggested your Center . . . .

(H03632). Despite his last statement, Dr. Parmer testified that he tried to encourage Mrs. Albach to maintain her relationship with Dr. Hess, since he was the most familiar with her internal abdominal anatomy. The Bariatric Center did not take her on as a patient, and suggested she return to Dr. Hess. She did not, at that time.

In October of 2000, Mrs. Albach had emergency surgery performed by Dr. Christopher Bruck, a surgeon in Bay City, to remove abdominal abscesses and repair leaks in her gastrointestinal system. She saw Dr. Parmer on November 2, 2000, weighing 111 pounds, and reported that, as reflected in his office notes, "[she] and her husband are both very angry over the problems she has had with this, and they have seen a lawyer and from the sounds of it are going to proceed with litigation against Dr Hess . . . ." (H03132). Dr. Parmer again encouraged her to return to Dr. Hess, since he had likely encountered problems like hers before.

Twelve days later, Mrs. Albach did return to Dr. Hess, complaining about her low weight. She did not provide medical records from Dr. Parmer or Dr. Bruck. Dr. Hess prescribed a drug called Creon, which Mrs. Albach took but did not refill. On December 1, she asked Dr. Carter to refer her to another bariatric surgeon, who suggested she return to Dr. Hess. She did on December 15, 2000, where he prescribed the antibiotic Cipro, though Mrs. Albach was already taking that drug on the advice of Dr. Carter. Finally, in February of 2001, Dr. Parmer referred Mrs. Albach to the Cleveland Clinic, where she eventually had her gastric bypass reversed.

4

**DISCUSSION**

Ohio law gave the Albachs one year from the time Mrs. Albach's physician-patient relationship with Dr. Hess ended to sue him for medical malpractice and loss of consortium; everyone agrees she "discovered" her injuries more than a year before she filed her complaint. Ohio Rev. Code § 2305.11(B)(1); (D)(3) (2001) (current version at Ohio Rev. Code § 2305.113(A), (E)(3)); *Frysinger v. Leech*, 512 N.E.2d 337, 341 (1987). The narrow issue before the Court, therefore, is whether Mrs. Albach's physician-patient relationship with Dr. Hess for her gastric bypass surgery and follow-up care ended before December 7, 2000. The Court concludes it did.

A physician-patient relationship is terminated by "conduct on the part of the patient which represents a departure from the directions and instructions given to the patient by the doctor of such a nature and a degree as renders it impossible for the physician to supervise the treatment of the patient, monitor the progress of the patient, properly treat the patient, and rectify any previous errors in the treatment of the patient." *Wenning v. Syntex Corp.*, 1981 Ohio App. LEXIS 13047, 19-20 (Ohio Ct. App. 1981). Specifically:

> Where a surgery patient has a date for an appointment with his physician for post-operative care and fails to keep that appointment and declines to ever see his physician again, the physician-patient relationship is finally terminated no later than the day of the appointment which the patient failed to keep.

*Millbaugh v. Gilmore*, 285 N.E.2d 19 (Ohio 1972) (paragraph one of the syllabus); *see also Buckley v. Jefferies*, No. 44724, 1993 Ohio App. LEXIS 12804, at *3-4 (Jan. 27, 1983).

In *Millbaugh*, the plaintiff surgery patient's "last contact" with his doctor was on March 27, 1959. The court explained that "[a]lthough plaintiff was scheduled to see Dr. Gilmore on April 27, 1959, he did not do so, nor did he see him as a patient thereafter. Thus, by necessary

implication the physician-patient relationship here was terminated not later than April 27, 1959." 285 N.E.2d at 21. The plaintiff claimed he continued after that date taking medicine the doctor had prescribed, though he admitted the doctor was unaware he had refilled the prescription. Instructively, the Ohio Supreme Court wrote that, "[t]he taking of the medicine in such an unsupervised manner *neither afforded Dr. Gilmore an opportunity to correct any errors on his part, nor provided a basis for the full treatment contemplated in a physician-patient relationship*." *Id*. (emphasis added). The court concluded that the "refusal of a patient to submit to further treatment by a physician terminates . . . the physician-patient relationship," and the patient's unsupervised taking of medicine does not "constitute a continuing course of treatment which will prevent the running of the statute of limitation for malpractice from the date of final termination of the physician-patient relationship." *Id*. (emphasis added).

The Ohio Supreme Court's conclusion in *Millbaugh* reflects the reason for the rule that "an action for professional malpractice does not accrue and limitations do not run while that professional relationship continues," *Frysinger*, 512 N.E.2d at 339, which is so that "[t]he patient may rely upon the doctor's ability until the relationship is terminated and the physician has the opportunity to give full treatment, including the immediate correction of any errors in judgment on his part," *Wyler v. Tripi*, 267 N.E.2d 419, 421 (1971).

In *Buckley*, the patient last saw her doctor on May 5, 1980, when he prescribed medication and told her to return to him in the fall. 1983 Ohio App. LEXIS 12804 at *2. The appellant did not return, and in October of 1980, sought a second opinion at the Cleveland Clinic. *Id*. The court found that though the patient's use of the medication as prescribed maintained the physician-patient relationship after her last office visit, the patient ended her relationship with the defendant

6

when she sought treatment from someone else: "in October, 1980, appellant chose to seek alternative medical advice. *It was this refusal to submit to further treatment by Dr. Jefferies in the fall of 1980 which signalled the termination of the doctor-patient relationship . . . .*" *Id*. at 3-4 (emphasis added).

Here, Mrs. Albach needed treatment for conditions including pain, fevers, diarrhea, constipation, and excessive weight loss, all relating to her the gastric bypass performed by Dr. Hess, yet she did not seek medical care from him. Her failure to return to Dr. Hess, or to even apprise him of her condition, between March 1999 and November 2000 amounts to conduct "rendering it impossible for the physician to supervise the treatment of the patient, monitor the progress of the patient, properly treat the patient, and rectify any previous errors in the treatment of the patient," thereby severing the physician-patient relationship.

Indeed, as in *Millbaugh*, she failed to report to a scheduled appointment and, on several occasions, expressly refused to return to Dr. Hess, despite the urging of several other doctors. As in *Buckley*, she manifested her refusal to return to Dr. Hess by instead seeking out alternative treatment from several other bariatric surgeons.

The Court finds Mrs. Albach terminated her relationship with Dr. Hess no later than the date of her missed follow-up appointment. The reason she missed the appointment is irrelevant under the applicable cases, which do not consider the patients' asserted reasons for not showing up. In any event, whether Mrs. Albach was seriously injured at the time, as her lawyer claimed, or forgot about the appointment and did not get a follow-up message from Dr. Hess's office, as Mrs. Albach claimed after opposing counsel revealed that she applied for and got a job at Burger King a few days before the missed appointment, she knew that following up with Dr. Hess was part of

7

the plan for her treatment. She must have realized eventually that the time for doing so had come and gone, yet she never rescheduled.

Moreover, her physician-patient relationship with Dr. Hess was not extended past the date of her missed September 1999 appointment by a continuing course of treatment. For over a year after that appointment, Mrs. Albach had no contact with Dr. Hess's office of a medical nature, and she admitted at trial that Dr. Hess provided her no care or treatment between March 20, 1999 and March 14, 2000. The parties hotly contest whether test results from blood work done in the spring of 1999 were sent to Dr. Hess. However, even if they were, like the unsupervised taking of medicine in *Millbaugh*, this alone did not "afford[] Dr. [Hess] an opportunity to correct any errors on his part, nor provide[] a basis for the full treatment contemplated in a physician-patient relationship."

Once Mrs. Albach terminated the physician-patient relationship by skipping or missing her appointment and refusing to return to Dr. Hess, she could not toll the statute of limitations by scheduling an office visit over a year later in November of 2000. *See, e.g.*, *Jones v. Peacock*, 584 N.Y.S.2d 333, 335 (N.Y. App. Div. 1992) ("The contact initiated by plaintiff about one year and 10 months later when her regular physician was unavailable was a renewal, rather than a continuation, of the patient-physician relationship."); *Anzel v. Gasso*, 507 N.E.2d 83, 86 (1987) ("The statute of limitations would become meaningless in medical malpractice actions if the limitations period could be circumvented by an isolated, final office visit.").

Finally, the Court finds Dr. Hess's instruction that his patients were free to see other doctors familiar with the procedure after surgery was not an intentional waiver of the statute of limitations. *See Boston v. Ohio Dep't of Human Servs.*, Nos. 94APE06-914, 94APE06-915, 1994

Ohio App. LEXIS 5837, at *7 (Dec. 20, 1994) ("Under Ohio law, for a waiver to be valid there must be an existing right, knowledge of that right, and an intention to relinquish such right."). Rather, Dr. Hess merely expressed his opinion that it was not medically necessary for his patients to maintain their physician-patient relationships with him after the surgery. That is to say that, medically, there was no reason they could not do what Plaintiff did: end the professional relationship with Dr. Hess and see someone else. Because Plaintiff ended her professional relationship with Dr. Hess no later than September of 1999, her December 2001 complaint was untimely.

## **CONCLUSION**

On the issue of the timeliness of Plaintiffs' claims, the Court finds in favor of the Defendant. Judgment in favor of Defendant on all claims is therefore appropriate.

IT IS SO ORDERED.

                                          s/ *David A. Katz*
                                          DAVID A. KATZ
                                          U. S. DISTRICT JUDGE